Mr. Simmons. Morning, Your Honor. Good morning. You reserve three minutes for rebuttal. That's right. Thank you. You may proceed. Okay. May it please the Court, I am John Simmons and I represent the appellant and patent applicants Michael Shore et al. What you have before you, Your Honor, is a classic case of impermissible hindsight reconstruction. It's clear throughout both applications, this is two applications, the 269 and the 627, that this examiner thought that this application was obvious, not based upon the prior art, but because the examiner thought it was obvious. And the examiner took no less than five references to back into that conclusion, basically combining disparate isolated disclosures and then modifying that combination without explicitly saying so, in order to, in hindsight, arrive at the claim invention. The examiner relies on, and you can refer to their brief pages 14 and 15, five references. Abrams at age 1657, Freeman, age 1487, Gerby, age 1671, Rui, age 1509, and a non-analogous prior art reference, Watkins, at age 1569. In order to make this cite our brief at page 22, which is in refine and also Abbott versus Sandoz, this is the precise type of picking and choosing analysis to deprecate the claimed invention that this court has sought to prevent. And to Abbott, in addressing the question of obviousness, a judge must not pick and choose amongst isolated elements from the prior art and combine them so to yield the invention in question, if some combination would not have been obvious at the time of the You are arguing that the Patent Office made an unreasonably broad interpretation of the claims. That's one of three things we're arguing, yes, your honor. And that the predetermined audience location, it's been appropriate to construe that to cover the entire audience, that it should be limited to a portion of an audience, right? Yes, your honor. This is an application that's simply pending. I'm sorry? This is simply a pending application that's on appeal. Yes. Is there anything that prevents you from amending the claim to insert, you know, a predetermined portion of the audience? No, there's not, but certainly the record is crystal clear, so whatever patent ultimately issues is going to be narrow claim, you're arguing that the claim should be more narrowly interpreted. Why not just amend it? Then there's no dispute about whether there's a proper claim construction or not. Okay, so if we may be heard, because we don't think we have to. The claim language that surrounds the words acts, because you're supposed to read the claim language in context of the words that surround it in the claim. Well, you don't have to, but if you don't, you wind up in a debate, and you wind up in a situation where your patent may not ever be issued. Well, we actually have ten continuations that have been allowed and granted, so I don't think that's the issue. The applicants feel strongly that the words chosen in this claim, and I will read the language to you to show you our point, should not be taken out of context, and basically the reference that they rely on, RUI, they actually modify it to go against its own purpose, and which is teaching away from that reference. They do not look at the claim language that surrounds it. So in the claim, and I'm reading from page five of their brief, and it's quotes claim one, which we say is an accurate representation. Hang on a second. Sure, fine. Okay, so if you look at the second clause, it says providing on a server a plurality of clips associated with the least one artist in track for each of the plurality of venues, at least one of the plurality of clips including footage of a predetermined audience location. The predetermined audience location being marked to indicate the presence within the predetermined audience location is captured for inclusion of the at least one of the plurality of clips. So that's the claim language that surrounds it. If it was the entire audience, there would be no reason to mark the entire audience as being included. That's the claim language. We go to the spec. The director does not point to any embodiment in the specification where our applicants said it can be the entire audience. There are instances where the applicants say it could be the entire audience, it could be a subset. They don't say that. The embodiments that are pointed to, and they accuse the applicants of incorporating a preferred embodiment. No, we're just looking at the claim language reasonably read and laid to the specification. At figure 10, I believe it's in, let's see, at the appendix, page 61, area 1012, and paragraphs 36 to 37, specifically show a small area, 1012, marked. RUI itself, RUI the reference that they use to show this entire audience, does not ever say that you could take a shot of the entire audience. I'm getting out of order, I'll try to bring it back full circle, but the RUI reference was actually for a lecture. So if you're recording a lecture, it was supposed to be an automated director or a smart director. So what it said is, I have this complicated system of microphones and calculations, and I'm going to determine in the audience who's speaking. Not a predetermined location, but which speaker is speaking so the individual, or on the lecturer. So in RUI, it never mentions using the entire audience as the predetermined location, and specifically teaches away from using a predetermined location because it's looking to the location of any speaker within the audience. So we wouldn't know if the speaker on the furthest left side of the room was speaking to focus in on him or her, versus the speaker in the middle of the room to focus in on him or her. So I say that we don't have to amend the claims, because if we amend the claims, then that can be interpreted as a narrowing of the claims for doctrine of equivalence. This applicant intends to license and to enforce these patents. You don't think the prosecution history that contains all the arguments you're making here today, wouldn't be a limiting, wouldn't be limiting in prosecution history of stock? It would be in claim construction, you're absolutely correct. But an absolute underlining of the word? What do you lose by just making the claim FESTO? Explicit. FESTO, prosecution history of estoppel. So if we amend that term, then that term is going to have no equivalence. And we don't think that the applicant, more importantly, doesn't think that that's necessary based upon the surrounding claim language, and based upon the supporting specification, which shows a subset, section 1012, figure 10, of the audience being marked. You think amendment-based estoppel is worse than argument-based estoppel? Based on the case law that we're aware of, yes. Are there family members of the application that contain the same claim language? This is the broadest claim language. This is the great-great-great-great-great-great-great-grandparent. So this is the original non-provisional application. The claims in the allowed, granted patents have similar but different variations of the language, but this is admittedly the why the applicants wanted to pursue this on appeal. They felt that this examiner, rightfully or wrongfully, took a whole bunch of references and piled them together. Now we understand, we didn't argue this, that you can take any number of references, but every time you add a reference, there has to be an articulated reason why you would combine those references, and how you would modify it if you're going to modify it. In this case, the examiner put four references together that were arguably related, audio-visual recording of a case, and then he added a fifth reference, which was not related, which was the Watkins reference, which is not analogous art, which the Watkins reference was directed to a security system. I believe if you look at the Watkins reference, the cover page, at A1569, or actually figure two makes it clear, figure two of Watkins is you have a security system. So an adult and a child enter into a secure facility, let's say a daycare or a store, and an image is taken of both the child and the adult at the entrance and or exit. So you can see in figure two, the mark is a predetermined mark, 48, is at the entrance or exit. That's all the examiner relies on for Watkins, is that it teaches a mark, a predetermined mark. We acknowledge Watkins teaches a predetermined mark. It doesn't teach a mark at the entrance or exit. That's the extent the examiner uses it for. But we argue it's not analogous art. The question here isn't whether the claims claim a mark, a location being marked to indicate the presence within a predetermined. It seems to me that your main complaint is that the term predetermined audience location has been interpreted too broadly. I would say that's one of our main complaints, because there's actually three. Okay, well there's that one. And if you lose there, you lose. Because your next argument is that even if you lose, the prior art doesn't apply. The second argument is that twofold. One, that what they're using the fourth and fifth references for, they being the examiner and now the director by adopting the examiner's position, is that they're taking RUI and saying that it teaches the entire audience as a shot, which is never disclosed in RUI. But RUI, admittedly, the director admits, RUI doesn't teach a predetermined location. Even if you said the predetermined audience location was broader than what we assert, which I disagree with, but we'll argue I don't, then you go and look at the reference Watkins that they're trying to modify the combination of Abrams, Freeman, Gervie, and RUI, which there's no explanation as to really why they go together, but we'll just assume they can. The Watkins reference does not teach using that predetermined location to be an audience location, and it's not analogous art. The examiner never said it's analogous art. In four office actions, two examiner answers, and the board and the director merely pay lip service to saying why it's analogous art and accuse us of waiving it. While we may not have used the magic incantation that it's analogous art and non-analogous art, we said Watkins isn't the same as the references. Watkins is directed at taking a still image, not video and audio, and using that still image to compare it to a second still image taken when the adult and child leave the secure facility. They compare, so you get still images, not video, clips. All the other references are directed to video clips that can be edited. These still images are used with data processing, such as facial recognition, to determine if the right child is living with the right adult. It's not an analogous art. Merely plucking out of it the predetermined location, because there happens to be a camera, is the definition of impermissible hindsight reconstruction, picking and choosing isolated disclosures amongst the references. That's what we're accusing them of. Even if you disregard our interpretation of predetermined audience location, which we do not think you can do, I think the examiner and the director have taken an overly broad reading, these references don't go together, and that's a matter of law. They have to say a reason why they're combinable and a reason why it's analogous art. Never does the examiner say it's analogous art. If you look, for example, at one of the office actions, I'll reserve my time, but I'll just put you to a site. At 732 through 734, this is typical of all the office actions and the answers. The analogous art walk-ins, there's no why. That's the examiner's duty. The examiner did not do his job here, and our applicants feel that they don't need to amend their claims because of that. Thank you. Mr. McBride. Yes. Good afternoon. May it please the court. There's three issues I'd like to touch upon. The first is the claim construction issue that was discussed. The director's position is that the board correctly applied the broadest reasonable interpretation to construe the predetermined audience location limitation as being any part of the audience and including the entire audience. That's a reasonable construction because the specification in the short application, it doesn't define what a predetermined in the specification. It doesn't use the word marked. That's introduced into the claims by amendments. We really had very little to go on other than figure 10, which is that A61 of the record. Figure 10 just shows that this audience location is element 1012, which is a hashed box. The specification, if you look at paragraphs 36 to 39, at A47 and A48 of the record, the specification actually says that figure 10 is simply a preferred embodiment. It's not limiting on the scope of the invention and that one of skill and the art would understand that you could make modifications to this layout. You can move the cameras around, for example. In light of that, I don't think the board's construction of that term, although broad, is unreasonable. Also, as Your Honor pointed out, the applicant could have amended the claim to more clearly articulate what the scope was in a number of ways. The second issue I'd like to touch upon is how the board correctly found that the prior art rendered obvious the marking a predetermined audience location. First, the examiner and the board found that Rui taught by taking video clips of specific audience members and it also disclosed taking pictures of the general audience when a person wasn't asking a question. This is in the record at A1518 in paragraph 15 of Rui. It specifically talks about how it's following these predetermined expert rules of videography to include video clips of the lecturer. Then when someone in that particular person, but it also says to make the video more enjoyable to the viewer, you should also include general shots of the audience when no one's asking a question. This is very clearly pointed out at A1526 of the record. That's Rui, paragraph 16. It talks about including how you, one way you can go about taking a picture of the general audience. It actually says, this is the paragraph A1526, paragraph 116. It spans the bottom of column one and goes across to the top of two. It talks about including general shots of the audience members and it says you do that by doing a slow pan from one side of the lecture room to the other. I think that makes it very clear. That's a predetermined audience location. That's not a single audience member. That's the audience and you're panning from one side of the lecture to the other. With regard to the random transitions, Rui also speaks to this at A1527, the next page, in paragraph 128. In the last sentence, it talks about at a microscopic level, each camera transition is random, resulting in an interesting video. It says at a macroscopic level, the transitions are random. They're actually following the expert rules of video production. They're not random shots. The transitions change, but they're following the rules. If someone talks, you're going to pan and zoom over here. If the lecturer's talking, you're going to pan and zoom to the lecturer. If no one's asking a question, you're going to include occasional shots of the audience. Another important point here is the board didn't rely exclusively on the teachings of Rui. The marking a part of or the entire audience would have been obvious to the skilled artisan. They say that on page five of the board decision at A6. They follow up and they go into more detail in rebutting Shor's arguments at page A8. They actually say, below the block quote on A8, they actually say, they're not persuaded that it wouldn't have been obvious to mark a predetermined audience location as taught by Rui. But then they go, they say, moreover, they're not persuaded that it wouldn't have been obvious based on the teachings of the prior as a whole to include various types of clips, including a predetermined audience location. They found that it was just a combination of old familiar elements to achieve predictable results. Shor doesn't rebut that argument. The board also said that just marking a predetermined audience location was not uniquely challenging. The last issue I'd like to touch upon was the printed matter rejection. This was an additional rejection that's not required to affirm the board's obviousness rejection. But the arguments that Shor asserts here do fall within the printed matter doctrine under this court's precedence in In Re De Stefano. It's a two-part test. First, you identify whether it's printed matter, and the test is whether the subject matter is claimed for its content, for its communication content. Here, the video clips are just communicating the events that happened at the live event at the particular location that's being recorded. Then the second part of that test is whether the printed matter structurally or functionally affects the substrate, which in this case is the server upon which the clips are stored. Here, the clips don't affect the structure of the server. They don't affect how it functions or operates. Users can access that server in the exact same way, regardless of the content that is recorded. The content of the clips may not affect the structure of the server, but the content of the clips is affected. Isn't that the whole point, is that you're going to have various clips with particular content that you can use to make a custom presentation? That's exactly right. The fact that you're pointing the camera at a particular location, whether it's the band or someplace in the backstage or the audience where people are tailgating, just because you're focusing on a different location doesn't make that somehow patentable. Shor's argument that you'd have to actually add a camera to the venue to focus on the audience doesn't make it patentable. All the primary references disclose using multiple cameras. I guess I'm just having a little difficulty as to why the printed matter doctrine is even relevant to this. I can understand that because when I first read it, I had to wrap my mind around it too, but I look at it this way. The video clips are really, they're not words, they're pictures, they're images and they record what's going on. If you look at the doctrine of the printed matter doctrine, printed matter is just subject matter claimed for what it communicates. Here, the video clips, their only purpose is to communicate the events that occurred at the event. If you agree with that, it's printed matter, then step two, it's clear that the video clips, however stored on the server or on the DVD that you create, it's not going to structurally affect that substrate, the server or the DVD, and it's not going to affect how that DVD or the server functions. Although it may be difficult to initially get your mind wrapped around this, because printed on something or symbols that are printed on something, I think it does fall within the doctrine as this court outlined in the rate of stephano. Thank you. Unless there's further questions, I'll sit down. Thank you very much. Briefly, on a couple of things that the solicitor touched on, he said that the board found that we're not persuaded that these references, the teachings of the cited references to provide various clips, including clips of predetermined audience locations to mark the presence indicated with it, would not be obvious. There's no evidentiary support cited. So it's the same thing that the examiner is guilty of, that the board just found that this is obvious. They said, oh, we would have found it obvious to make that teaching in the reference, but they're not pointing to anything in the reference. It's just the board saying it. There's nothing to support that position. Same thing with any part of the audience or the entire audience. There's no evidentiary support in RUI that the entire audience is in RUI. In fact, when the solicitor read, he said, the slow pan from one side to the other. A pan does not include the entire audience all at once. In fact, RUI never says that. RUI only talks about going to the person who is speaking or doing a pan of the audience or for the viewer's enjoyment so they don't get bored looking at the lecturer. Back at the specification paragraphs 36 and 39 of our application, which is at 848 and 49, the solicitor pointed to boilerplate language saying that this is a preferred embodiment, but other embodiments could apply. This court never relies on boilerplate language, especially if it was to help our side. But nonetheless, our applicant never said that the predetermined audience location could be the entire audience. In fact, to the contrary, the preferred embodiment, pretty much the only embodiment that's described in detail, says that the predetermined audience location is a sub-spot. So you're a ticket holder and you want to go get your video of you at that venue so you can later create a video of you and the musical performance and link those together. That's what the concept of the predetermined audience location was for. That's what's described in the specification and that's how it's claimed. If there are no further questions. No, thank you. Thank you very much for your time, Your Honor. Have a great day.